Plaintiff, James F. Byrne, filed this suit seeking to recover of defendant, Albert J. Ortte, the sum of $1,200, the matured amount on a promissory note for $2,000 payable in installments, executed by defendant as part of the purchase price paid for plaintiff's interest in a partnership which, prior to the sale, had existed between them. Defendant answered claiming that there was no consideration for the note, and prayed for a dismissal of the suit, and in reconvention claimed from plaintiff the sum of $3,925.20. The matter was tried on its merits by the Twenty-fourth Judicial District Court for the Parish of Jefferson, and plaintiff's suit was dismissed; defendant's reconventional demand was allowed, and there was judgment in his favor and against plaintiff for the amount prayed for therein. Plaintiff has appealed.
The facts disclosed by the transcript are that plaintiff operated a business in New Orleans known as Air Lite Metal Awning Company for a period of about eight months; that he manufactured metal awnings under a license or franchise from the Brown Manufacturing Company of Oklahoma City, Oklahoma, the holder of certain patents controlling the manufacture of metal awnings of a unique and novel type. Plaintiff owned the physical assets of the business, which included machinery, tools, equipment, appliances, etc.
On November 9, 1945, by written contract, plaintiff and defendant formed a partnership for the operation of the business, and each of the partners bound himself to furnish capital to the partnership to the extent of $6,000, it being agreed that defendant should advance his share from time to time whenever the requirements of the business necessitated working capital. During the life of the partnership, Ortte, on several occasions, advanced various sums which aggregated $1,400.
It is not shown whether the partnership venture was successful, but Byrne and Ortte maintained their status as partners for about two months, or until January 8, 1946, on which date they appeared before a notary public, and Byrne, by authentic act, sold his entire interest in the business to Ortte, the subject matter of the sale being set forth in the act as follows: "All of his right, title and interest in and to the goodwill, the use of the name, 'Air-Lite Metal Awning Co.', the exclusive right to all the trade marks and labels as used by and owned by the said James F. Byrne, in connection with the said 'Air-Lite Metal Awning Co.'; all of the articles, machinery, tools, implements and appliances of every kind whatsoever used or designated to be used in the manufacture of Air-Lite Awnings; and all of the delivery equipment, all of said property now being located at 509 Tchoupitoulas Street in the City of New Orleans."
There was offered and admitted in evidence a photostatic copy of the original act of sale, which recites that the consideration paid by Ortte was $2,800, of which $800 was paid in cash, and for the balance a non-interest bearing note for $2,000, dated January 8, 1946, payable at the rate of $300 per month, was executed by Ortte and delivered to Byrne. As an additional consideration, defendant assumed certain obligations of the partnership, among which was a note due the Hartsfield Company, Inc., for $925.20, secured by chattel mortgage on the machinery and equipment of the business.
Ortte contends that there was no consideration for the note representing the deferred portion of the price, and testified that Byrne, under his arrangement with the patentee of the metal awnings, had no right or authority to sell or transfer the business without the written consent and approval of the patentee, which had not been obtained when the sale was made, and that he accordingly received nothing from the sale and is not liable on the note. His counsel argues that the attempted sale was null, as Ortte received only a defective or imperfect title to the business.
[1] Whilst the testimony does not indicate the precise nature of the franchise which Byrne held from the patentee, we gather from the record that it was personal *Page 211 
to Byrne, and could not be disposed of by him without the consent of Brown Manufacturing Company.
It appears that both Byrne and Ortte were cognizant of this restriction in the franchise, and both knew, and well understood, that it could not be transferred without the intervention of the patentee. In that connection, our attention is directed by Byrne's counsel to paragraph 11 of their articles of copartnership, which reads as follows: "It is understood and agreed between each of the respective partners that should either partner wish to sell, transfer or otherwise dispose of his interest, the other partner to this agreement shall have the right and option to purchase such interest, which interest shall be ascertained by an inventory of stock, goods and accounts, and a balance sheet struck, and the interest of the retiring partner acquired at the amount as reflected in such balance sheet from the books of account. This agreement to sell however, among the respective partners to this agreement must be predicated on an approval by one L.G. Brown of the Brown Manufacturing Company of Oklahoma City, Oklahoma, it being the intention of the partners to this agreement to have the full acquiescence of any existing agreements that may be in force or in effect between the partners to this agreement and the said L.G. Brown."
The impression is immediately formed, by virtue of the presence of the quoted stipulations, that Ortte was well aware that Brown's approval was necessary in the transaction, and it follows that he knew, or should have known, that as the transferee of Byrne he might be denied the right to manufacture the metal awnings and operate the business if the patentee's approval was not first secured. Ortte admits that before the sale was signed Byrne called L.G. Brown of the Brown Manufacturing Company, by long distance telephone, and requested him to come to New Orleans to discuss the contemplated sale. Ortte was present and also spoke with Brown, who promised to make the trip in a few days. Ortte appears to have been satisfied with this arrangement and the sale was passed on the same day the telephone conversation took place. Thus knowing the circumstances surrounding the franchise, caution should have dictated to Ortte that he should not enter into the sale without first having Brown's written approval of the transaction. But, of course, he had the right to take a chance and buy the business without such prior consent, which course he chose to pursue. He made the step with his eyes wide open, and having thus acted, whatever difficulty arose afterward was brought about by his imprudence, and he is without right to complain, under the circumstances, that his title is defective or imperfect, and our opinion is that he is liable for the purchase price.
[2] The jurisprudence is to the effect that where a purchaser knows of a defect in a title he is about to acquire, he is precluded from calling upon the vendor to make good any deficiencies. Harang v. Blanc et al., 34 La. Ann. 638; Werk v. Leland University, 155 La. 971, 99 So. 716; Tennent v. Caffery et al., 170 La. 680, 129 So. 128.
In Harang v. Blanc, supra, the Court said: "When a party, before buying, knows of the defect of his own vendor's title, he is not entitled to withhold or suspend the payment of the price, nor demand security against eviction, if he be threatened therewith, on account of such defect."
[3] Brown, who appeared as a witness for defendant, testified that because of other business matters he could not make the trip to New Orleans as quickly as he expected, and that Ortte called him by telephone "* * * to get it straightened out with me" and that he informed Ortte that he, Brown, intended to operate the business himself.
Brown did arrive about a week after the sale, and in a conversation with Ortte reiterated his intention to operate the business himself. Ortte explained to Brown that he had invested a considerable amount of money in the business, and that he felt he was financially and otherwise capable of conducting it, and importuned Brown to give his consent. There were some negotiations between the parties, and Brown ultimately agreed to issue Ortte "a letter of *Page 212 
authority" in consideration of $500, which defendant paid him. Brown testified that Ortte at the time of the trial below was still operating the metal awning business, and that he was "doing very nicely."
The payment made to Brown is one of the items claimed in defendant's reconventional demand — Ortte contends that he should have reimbursement from Byrne therefor. Plaintiff concedes that it was necessary for defendant to pay the amount to Brown, but maintains that he has repaid the $500 to defendant.
Plaintiff testified that after Brown's visit, a material alteration was made in the act of sale, to which both he and Ortte agreed. He explains that the instrument as originally drawn provided that the sale was made for $800 in cash, and that the balance of the purchase price was stipulated as $3,500, and that Ortte had signed a note for that sum and delivered it to him. He stated further that the day after Brown's visit Ortte called at the office of the Air Lite. Metal Awning Company and complained that, considering the $500 payment given Brown, he was paying too much for the business, and that he thought the amount of his note should be reduced. Byrne testified: "I told Mr. Ortte that anything he wanted, that he thought was fair, I would be glad to accept. He said he would give me a note for $2,000.00 and pay me $800.00 cash. I took him up on his offer. * * *"
Byrne stated further that after this agreement, defendant executed another note for $2,000, which was to take the place of the original one, and that when it was delivered to him the first note was returned to defendant at plaintiff's home and the act of sale was changed to meet with this new situation. Ortte's counsel argues that there was no such subsequent arrangement, and insists that the note which forms the basis of this suit was the only note involved in the transaction. However, Ortte testified as follows:
"Q. This note marked 'P-2' — is this the note Mr. Weigel drew up also? A. I believe so. I don't know whether he drew it up. I signed it in the bank. I went over and bought the note form myself from the F. F. Hansell store.
"Q. What happened to the original note that Mr. Weigel drew up? A. I don't know.
"Q. Wasn't that note for Thirty-five Hundred Dollars ($3,500.00)? A. I don't think.
"Q. It was more than Twenty-eight hundred Dollars ($2,800.00), wasn't it? A. Yes, I think it was.
"Q. In other words, what happened was: You and Mr. Byrne went to Mr. Weigel's office and drew up an act of sale whereby you purchased Mr. Byrne's interest in that partnership for Eight Hundred Dollars ($800.00) cash and a note for Thirty-five Hundred Dollars ($3,500.00), isn't that correct? A. I don't remember that part. I remember only the sale that we made, which was final and which was for Twenty-eight Hundred Dollars ($2,800.00).
"Q. Had you not signed the first note? A. I don't know whether I did or not; but it was destroyed."
He also testified:
"Q. Did you ever have occasion to go to Mr. Byrne's home? A. I don't believe.
"Q. You never went out there with him? A. I don't remember going to his house. I drove him home once, and left him in front of his house; but I did not visit his house.
"Q. When this note which is marked 'P-2' was drawn, did you not go to Mr. Byrne's home with him, on Humanity Street, directly from the Whitney National Bank, and get the other copy of this act of sale which he had which showed a larger amount? A. I might have."
Our careful study of the testimony of the parties respecting the notes leads us to the conclusion that that of Byrne should prevail. His testimony appears to be frank and straightforward, while on the other hand defendant's is vague and evasive. There is no doubt in our minds that after Brown's visit there were negotiations between plaintiff and defendant, and that the arrangement spoken of by Byrne was the outcome, and that the original deferred *Page 213 
price of the sale was reduced for the purpose of making allowance for the outlay that Ortte found it necessary to make in order to continue to enjoy the use of the Brown patents for the manufacture of metal awnings.
[4, 5] Defendant's reconventional demand is premised upon the theory that the sale was defective or imperfect, and that he received nothing from it, and that he is entitled to the return of the $1,400 which he advanced to the partnership the $800 cash portion of the purchase price, and also two amounts which he claims were paid to satisfy obligations owed by the business and which he assumed in the act of sale.
It is extremely difficult to understand the position assumed by defendant. By virtue of the sale there was delivered to him the trade name and good will of the business, and all of the physical assets (except two riveting machines), among which were machinery, tools, fixtures, supplies, office furniture, accounts receivable, and even the balance in the partnership bank account. Eliminating the franchise, from consideration, the assets of the business were still of considerable value, and Brown, appearing as defendant's witness, testified that their resale value was at least $1,500, and that he would be willing to pay $2,700 for the business. Defendant at the moment of the sale received all of plaintiff's interest in that which belonged to the Air Lite Metal Awning Company, which he still retains and still makes use of. His counsel, in oral argument, maintained that Ortte has the right to keep the business as his own, and at the same time advances the tenuous contention that he should be relieved of liability on the note, and in addition to this should recover all amounts paid to Byrne, together with the $1,400 paid into the partnership as part of the amount he agreed to advance.
Even if we were to hold that the sale was such that it was subject to rescission, the defendant could not obtain the relief sought, for it is well settled, and we deem it unnecessary to cite authorities, to the effect that one seeking relief through rescission of a contract of sale must first offer to restore his adversary to the position he was in at the time the contract was entered into, and must either return the property, or account for it. Ortte has not alleged tender, nor does the evidence show that he at any time ever offered to return the subject matter of the sale to Byrne.
For the reasons assigned, the judgment appealed from is reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, James F. Byrne, and against the defendant, Albert J. Ortte, for the sum of $1,200, with legal interest from judicial demand until paid, plus ten per cent attorney's fees, and that the right of James F. Byrne to file suit for all remaining installments on the note sued upon be reserved. Defendant's reconventional demand is dismissed.
Defendant-appellee is to pay all costs.
Reversed.